UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 7/14/2016

---

JUAN GUTIERREZ ARIAS,

      Petitioner,

   v.

OSCAR AVILES, in his official capacity as
Warden of Hudson County Jail;
CHRISTOPHER SHANAHAN, in his official
capacity as New York Field Office Director
for U.S. Immigration and Customs
Enforcement; JEH JOHNSON in his official
capacity as Acting Secretary of Homeland
Security; LORETTA LYNCH, in her official
capacity as the Attorney General of the
United States; and the U.S. DEPARTMENT
OF HOMELAND SECURITY,

      Respondents.

No. 15-CV-9249 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

  Petitioner Juan Gutierrez Arias, a United States legal permanent resident ("LPR"), brings this petition for a writ of habeas corpus seeking a bail hearing to review his ongoing detention by the Department of Homeland Security ("DHS"). He argues that the Second Circuit's decision in *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015), *cert. denied*, No. 15-1307, 2016 WL 1626440 (U.S. June 20, 2016)—which required that aliens convicted of certain crimes and detained during the pendency of their removal proceedings receive bail hearings within six months of their detention—should be extended to LPRs detained upon seeking reentry to the United States after brief trips abroad. The Court agrees.

  Gutierrez Arias is entitled to the same due process protections afforded the petitioner in *Lora* and is accordingly entitled to a bail hearing. Consistent with the Second Circuit's

constitutional avoidance analysis in *Lora*, this Court construes the statutory provision pursuant to which Gutierrez Arias is detained to contain an implicit six-month time limit, after which he is entitled to a hearing to determine if he may be granted bail. As Petitioner has now been detained for more than twelve months, such a hearing is required. The Petition is granted.

## BACKGROUND

Gutierrez Arias, a citizen of the Dominican Republic, was granted LPR status on June 26, 1999. Pet. ¶ 3; Response, Ex. A. He has resided in this country continuously since that time. Pet. ¶ 3. In February 2013, he left the United States for "a brief trip to the Dominican Republic of approximately eight to ten days after the death of his uncle." Oral Arg. Tr. (hereinafter "Arias Oral Arg.") at 2:20–22. He returned on February 17, 2013 through New York's John F. Kennedy Airport, at which time federal law enforcement officials found cocaine and pills in his luggage and took him into custody. *See* Response, Ex. A. On September 15, 2014, Gutierrez Arias pled guilty to Criminal Possession of a Controlled Substance in the Third Degree and was sentenced by the New York State Supreme Court to a term of imprisonment of one year. Pet. ¶¶ 9–10. According to the Petition, on May 17, 2015, he completed his sentence and was transferred back to DHS custody. *Id.* ¶ 11.[1]

Upon Petitioner's return to federal custody, DHS detained him as "an arriving alien." *See* 8 U.S.C. § 1225(b).[2] "The term arriving alien means an applicant for admission coming or

---

[1] While the Petition states that Gutierrez Arias was returned to DHS custody on May 17, 2015, Pet. ¶ 11, other submissions indicate DHS took custody of Gutierrez Arias on May 7, 2015. *See* Decl. of Deportation Officer Jaime Rodriguez ¶ 3; Response, Ex. A (listing May 7, 2015 on the Notice to Appear).

[2] Although Gutierrez Arias was paroled into the United States for the purpose of prosecution, he is still treated, for constitutional purposes, as if stopped at the border due to the "'entry fiction,' which provides that although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Napoles v. I.N.S.*, 278 F. Supp. 2d 272, 275 (D. Conn. 2003) (quoting *Barrera–Echavarria v. Rison*, 44 F.3d 1441, 1450 (9th Cir. 1995)).

attempting to come into the United States at a port-of-entry . . . ." 8 C.F.R. § 1001.1(q). Arriving aliens are subject to mandatory detention by DHS pursuant to 8 U.S.C. § 1225(b), which provides:

> [I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding.

8 U.S.C. § 1225(b)(2)(A). This provision applies to all non-resident aliens suspected of being inadmissible.

LPRs returning from abroad are generally not assigned this label. *See* 8 U.S.C. § 1101(a)(13)(C). Where, however, LPRs fit into one of six categories, including those who "engage[] in illegal activity after having departed the United States," the law requires that they be treated as arriving aliens and detained. 8 U.S.C. § 1101(a)(13)(C)(iii).[3] Despite his status as an LPR, Gutierrez Arias was thus detained under § 1225(b) in light of his illegal activity. DHS thereafter initiated removal proceedings and Gutierrez Arias has been detained by DHS without bail since his return to federal custody. Pet. ¶ 11.

On October 28, 2015, the Second Circuit issued its opinion in *Lora*, holding that an immigrant convicted of a crime for which detention pending removal is required by 8 U.S.C. § 1226(c), must be afforded a bail hearing before an immigration judge within six months of his or her detention. *See* 804 F.3d at 616. In his Petition, Gutierrez Arias urges this Court to apply *Lora* to LPRs detained pursuant to 8 U.S.C. § 1225(b).

---

[3] An LPR is deemed an arriving alien only if he: "(i) has abandoned or relinquished [LPR] status; (ii) has been absent from the United States for a continuous period in excess of 180 days; (iii) has engaged in illegal activity after having departed the United States; (iv) has departed from the United States while under legal process seeking removal of the alien from the United States . . . ; (v) has committed an offense identified in section 1182(a)(2) of this title . . . ; [or] (vi) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(C).

## **JURISDICTION**

This Court has subject matter jurisdiction over the Petition under 28 U.S.C. § 2241(c)(3). *See, e.g.*, *Louisaire v. Muller*, 758 F. Supp. 2d 229, 234 (S.D.N.Y. 2010) (collecting cases in which courts "exercised jurisdiction to decide similar questions of statutory interpretation under the . . . mandatory detention statute"). While the laws governing immigration detention prohibit judicial review of the government's "discretionary judgment regarding the application of this section," 8 U.S.C. § 1226(e), the "issue presented by [the P]etition is the construction of the mandatory detention statute, not a discretionary decision whether or not to grant release on a bond." *Straker v. Jones*, 986 F. Supp. 2d 345, 350 (S.D.N.Y. 2013). The Court thus has jurisdiction to consider the statute in light of constitutional concerns. *See Demore v. Kim*, 538 U.S. 510, 517 (2003) ("Section 1226(e) contains no explicit provision barring habeas review, and we think that its clear text does not bar respondent's constitutional challenge to the legislation authorizing his detention without bail.").

## **DISCUSSION**

Gutierrez Arias argues that his detention for more than twelve months under § 1225(b) violates the Due Process Clause of the Fifth Amendment and that the Second Circuit's decision in *Lora* compels this Court to grant his Petition. The Government counters that *Lora*, which analyzed a different provision of the immigration detention laws, does not apply to § 1225(b). Although two courts in this district have recently declined to extend *Lora* to LPRs detained as arriving aliens under § 1225(b), *see Perez v. Aviles*, No. 15-CV-5089 (JFK), 2016 WL 3017399, at *3 (S.D.N.Y. May 24, 2016); *Cardona v. Nalls-Castillo*, No. 15-CV-9866 (SAS), 2016 WL 1553430 (S.D.N.Y. Apr. 14, 2016), this Court respectfully reaches a different conclusion. The Court agrees with Petitioner that the logic of *Lora* extends to circumstances in which an LPR, returning from only a

4

brief trip abroad, is detained pursuant to § 1225(b). As did the *Lora* court when considering § 1226(c), this Court construes § 1225(b) as containing a bright-line six-month limitation after which LPRs like Gutierrez Arias must be granted a bail hearing.

**I.     The Second Circuit's Decision in *Lora***

On October 28, 2015, the Second Circuit affirmed the district court's grant of habeas corpus to Alexander Lora. *See Lora*, 804 F.3d at 606. Lora, an LPR and citizen of the Dominican Republic, was detained by DHS pursuant to 8 U.S.C. § 1226(c) following his release from a prison term for drug offenses. *Id.* at 607–08. Section 1226(c) mandates that DHS detain aliens living within the United States who are convicted of certain crimes, including the drug crimes Lora committed. *Id.* Lora challenged his detention under § 1226(c), arguing that the lack of any temporal limitation in the statute violated the Due Process Clause of the Fifth Amendment. *Id.* The Second Circuit agreed.

The Lora Court began its analysis of this issue with a discussion of the Supreme Court's decisions in *Zadvydas v. Davis*, 533 U.S. 678 (2001) and *Demore v. Kim*, 538 U.S. 510 (2003). *Lora*, 804 F.3d at 613–14. In *Zadvydas*, which held that mandatory detention following a final order of removal was presumptively reasonable for only six months, the Supreme Court "signaled its concerns about the constitutionality of a statutory scheme that ostensibly authorized indefinite detention of non-citizens," ruling that "'[t]he Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary or permanent.'" *Lora*, 804 F.3d at 613 (quoting *Zadvydas*, 533 U.S. at 693). In *Demore*, the Court "upheld the constitutionality of section 1226(c)"—the provision at issue in *Lora*—but "emphasized that, for detention under the statute to be reasonable, it must be for a brief period of time." *Lora*, 804 F.3d at 613–14 (citing *Demore*, 538 U.S. at 528). "These cases," the *Lora* court

held, "clearly establish that mandatory detention under section 1226(c) is permissible, but there must be some procedural safeguard in place for immigrants detained for months without a hearing." *Id.* at 614. The circuit thus "conclude[ed] that in order to avoid serious constitutional concerns, section 1226(c) must be read as including an implicit temporal limitation" or, in other words, "some 'reasonable' limit on the amount of time that an individual can be detained without a bond hearing." *Id.*

Having determined that due process mandates a reasonable limit on the length of detention under § 1226(c), the Second Circuit went on to assess "how to determine reasonableness." *Id.* The court elected to follow the Ninth Circuit and apply "a bright-line rule to cases of mandatory detention where the government's 'statutory mandatory detention authority under Section 1226(c) . . . [is] limited to a six-month period, subject to a finding of flight risk or dangerousness.'" *Id.* at 614 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1133 (9th Cir. 2013) (hereinafter "*Rodriguez II*")) (alterations in original). The court rejected the procedure followed in other circuits, which requires district courts to make case-by-case determinations on the reasonableness of each petitioner's detention. *Id.* The circuit cited four reasons for the bright-line approach. First, "*Zadvydas* and *Demore*, taken together, suggest that the preferred approach for avoiding due process concerns in this area is to establish a presumptively reasonable six-month period of detention." *Id.* at 615. Second, a bright-line rule will prevent inconsistent and confusing results in the district courts. *Id.* Third, such a rule is especially important in light of the size of the immigration docket within the Second Circuit. *Id.* at 615–16. Finally, the court stated that, "without a six-month rule, endless months of detention, often caused by nothing more than bureaucratic backlog, has real-life consequences for immigrants and their families." *Id.* at 616.

6

## II.     Extending *Lora* to § 1225(b)

Gutierrez Arias urges the Court to extend *Lora*'s holding to his Petition. He argues that he is entitled to due process as an LPR and that, as such, the *Lora* court's constitutional avoidance analysis applies equally to the mandatory detention provision in § 1225(b) as it did to § 1226(c). *See Lora*, 804 F.3d at 614 (construing § 1226(c) to "avoid serious constitutional concerns"). The Government responds that Gutierrez Arias, as an arriving alien, "do[es] not have the same due process protections as aliens who have been admitted"; that this Court should "defer" to Congress's statutory scheme that "lessens any possible due process concerns"; and that, even if the Court determines that the scheme itself is insufficient to protect Gutierrez Arias's rights, the Court should neither find his detention unreasonable nor adopt a strict six-month rule. Opp. at 2, 6, 14, 16–19.

The Court rejects these arguments and finds (i) that Gutierrez Arias, as an LPR, retained the same constitutional protections he possessed before leaving the United States, (ii) that § 1225(b) must be construed to avoid due process concerns, and (iii) that a six-month limit as outlined in *Lora* is the appropriate limiting principle in this circuit.

### A.     Due Process Rights of Returning LPRs

The Government acknowledges that LPRs returning to the United States are entitled to some due process rights, but argues "that aliens seeking admission do not have the same due process protections as aliens who have been admitted" and thus that "some returning LPRs, like Arias . . . are not entitled to the same level of constitutional protections as others." Opp. at 6; Oral Arg. Tr., *Saleem v. Shanahan*, No. 16-CV-808 (RA), Dkt. 19, at 11:4–6 (S.D.N.Y. Apr. 14, 2016) (hereinafter "Saleem Oral Arg.") ("[The Government] partially agree[s] with opposing counsel on

7

this, the question is not whether he has any due process rights.").[4]  Gutierrez Arias contends that, as an LPR who left the country for only a brief time, he is entitled to the same due process protections afforded to the petitioner in *Lora*. Pet. ¶¶ 15–16. The question before the Court, then, is to what due process Gutierrez Arias is entitled.

All aliens present inside the United States are entitled to due process. *See Zadvydas*, 533 U.S. at 693 ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States."). These protections extend to aliens that are subject to a final order of deportation as well as those who entered the country illegally. *See id.* at 693–94 ("[T]his Court has held that the Due Process Clause protects an alien subject to a final order of deportation."); *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments.").

Under Supreme Court precedent, LPRs present inside the United States are entitled to more robust constitutional protection than aliens without any legal status.  "[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *accord Woodby v. Immigration & Naturalization Serv.*, 385 U.S. 276, 286 (1966) ("[M]any resident aliens have lived in this country longer and established stronger family, social, and economic ties here than some who have become naturalized citizens."); *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950) ("The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society.").  More

---

[4] The Court jointly held oral argument in this case and in *Saleem v. Shanahan*, No. 16-CV-808 (RA), (S.D.N.Y.), which presented similar issues. *See generally* Saleem Oral Arg.  During the argument in *Saleem*, the Government addressed both cases. *See id.* at 13:7–21.

specifically, "he becomes invested with the rights guaranteed by the Constitution to all people within our borders . . . includ[ing] those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 598 n.5 (1953); *accord Demore*, 538 U.S. at 547 (Souter, J. concurring in part and dissenting in part) ("The law therefore considers an LPR to be at home in the United States, and even when the Government seeks removal, [the Supreme Court has] accorded LPRs greater protections than other aliens under the Due Process Clause."). Indeed, the Petitioner in *Lora* was an LPR and the Second Circuit held that the Due Process Clause prohibited his indefinite detention, even though he had been convicted of crimes for which removal is explicitly authorized. 804 F.3d at 606–07 (citing 8 U.S.C. § 1227(a)(2)(B)).

The Government argues that this constitutional analysis changes—for both LPRs and non-resident aliens—when aliens attempting to enter the country present themselves for admission at United States ports of entry. *See* Opp. at 6. This is because "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). As the Supreme Court stated in *Zadvydas*, "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." 533 U.S. at 693. But the question presented here is to what constitutional protection LPRs arriving at the border are entitled upon returning from a brief trip abroad. The Government contends that "the amount of process Congress gives is the amount that's due under the Constitution." Saleem Oral Arg. at 11:8–10. An analysis of Supreme Court precedent, however, suggests that LPRs are entitled to more.

Three Supreme Court decisions have explored the extent of constitutional protections afforded LPRs attempting to reenter the United States: *Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953), *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), and *Landon v. Plasencia*, 459 U.S. 21 (1982). In *Chew*, the Court considered for the first time whether the Government could exclude an LPR seeking readmission without any process. *See* 344 U.S. at 592. Chew, "a Chinese seaman . . . admitted to permanent residence in the United States," left the country for a four-month voyage aboard an American merchant vessel. *Id.* at 592–93. Upon his return to the United States "the immigration inspector ordered him 'temporarily excluded' . . . as an alien whose entry was deemed prejudicial to the public interest." *Id.* at 594–95. The Court "consider[ed] first what would have been [Chew's] constitutional right to a hearing had he not undertaken his voyage," and concluded that "a lawful permanent resident of the United States [who] remains physically present there . . . may not be deprived of his life, liberty or property without due process of law." *Id.* at 596–97. The Court next explained that Chew—despite his trip abroad—was entitled to these same constitutional protections, reasoning that his absence from the United States aboard an American vessel was not, according to the relevant regulations, a break in residency in the naturalization laws. *Id.* at 600–01. "For purposes of his constitutional right to due process," the Court thus stated, "we assimilate petitioner's status to that of an alien continuously residing and physically present in the United States." *Id.* at 596.[5]

In *Mezei*, the Court further examined the limits of due process protections for LPRs returning from abroad. *See* 345 U.S. at 206. Having decided *Chew* "[o]nly the other day," the

---

[5] When presented with the constitutionality of the statute that the Government argued permitted Chew's detention without due process, the *Chew* Court "interpret[ed] this regulation as making no attempt to question a resident alien's constitutional right to due process," such that it avoided the need to reach this constitutional question. 344 U.S. at 598–600; *see also Plasencia*, 459 U.S. at 33 (noting that the *Chew* Court "construed the regulation as inapplicable" to "avoid constitutional problems").

10

Court sought to determine whether Mezei, an LPR who had traveled to Eastern Europe for over a year-and-a-half during the cold war, retained his due process rights, as had Chew, or whether he should be treated for constitutional purposes as "an alien on the threshold of initial entry." *Id.* at 212–13. Ultimately, although it had held in *Chew* "that under some circumstances temporary absence from our shores cannot constitutionally deprive a returning lawfully resident alien of his right to be heard," it found that Mezei's "history . . . drastically differs from that disclosed in Chew's case." *Id.* at 213–14. The Court explained:

> Unlike Chew who with full security clearance and documentation pursued his vocation for four months aboard an American ship, respondent, apparently without authorization or reentry papers, simply left the United States and remained behind the Iron Curtain for 19 months. . . . In such circumstances, we have no difficulty in holding respondent an entrant alien or 'assimilated to (that) status' for constitutional purposes.

*Id.* at 214. The *Mezei* Court thus ruled that it did "not think that respondent's continued exclusion deprives him of any statutory or constitutional right." *Id.* at 215.

Nearly thirty years later, the Court in *Plasencia* held that an LPR who left the country for two days to smuggle aliens back across the border was entitled to due process protections. *See Plasencia*, 459 U.S. at 33–34. The Court found *Chew* to be controlling, explaining that "[t]he reasoning of *Chew* was only that a resident alien returning from a brief trip has a right to due process just as would a continuously present resident alien." *Plasencia*, 459 U.S. at 31. This conclusion was premised upon "the rule that a continuously present permanent resident alien has a right to due process," and that "'[f]or purposes of his constitutional right to due process, we assimilate [the arriving LPR] petitioner's status to that of an alien continuously residing and physically present in the United States.'" *Id.* at 33 (quoting *Chew*, 344 U.S. at 596). With respect to *Mezei*, the *Plasencia* Court noted that "[*Mezei*] does not govern this case, for [the *Plasencia* petitioner] was absent from the country only a few days, and the United States has conceded that

11

she has a right to due process." *Id.* at 34. The Court thus drew a distinction between an LPR only briefly absent from the United States who can assert due process rights, and one whose "absence is extended . . . [and thus] may lose his entitlement to 'assimilat(ion of his) status to that of an alien continuously residing and physically present in the United States.'" *Id.* at 33 (quoting *Chew,* 344 U.S. at 596).

The parties dispute whether Gutierrez Arias, upon returning from his eight-to-ten-day trip, forfeited his rights as the petitioner did in *Mezei* or retained them as in *Chew* and *Plasencia.* *Compare* Opp. at 12–13 *with* Reply at 5. The Court concludes the latter, namely, that Gutierrez Arias retains his constitutional rights despite his brief absence from the United States.

*Mezei* is distinguishable on at least two grounds. First, courts have refused to apply *Mezei* where, as here, the LPR's absence was brief. *See Plasencia,* 459 U.S. at 34 ("[Mezei] does not govern this case, for [the petitioner] was absent from the country only a few days . . . ."); *Rafeedie v. I.N.S.,* 880 F.2d 506, 522 (D.C. Cir. 1989) ("[T]he only relevant question was whether the alien had been gone so long as to lose her permanent resident status."). Although the Supreme Court has not identified the length of absence that will diminish an LPR's rights, courts "look[] to the naturalization laws to determine what would be a sufficient time abroad to divest the alien of his due process rights." *Rafeedie,* 880 F.2d at 522. In particular, courts rely on the amount of time that an applicant for citizenship can be absent without endangering his application—currently six months. *See id.* at 522 (citing 8 U.S.C. § 1427(a) (absence of less than six months deemed not to interrupt continuous residence for naturalization purposes)).[6] Here, Gutierrez Arias's eight-to-ten-

_____

[6] In *Skelly v. I.N.S.,* 168 F.3d 88 (2d Cir. 1999), the Second Circuit was presented with the question of whether a twenty-one day absence might deprive an LPR of her rights under *Mezei,* but declined to rule on the issue, instead "assuming without deciding" that LPRs retained constitutional protections during absences of this length. *Id.* at 91 ("Skelly's case, however, presents a more knotty question that we need not decide to resolve this appeal: whether Skelly had effectively severed her connection to the United States and therefore her status as a continuous resident by returning to St. Lucia for twenty days.").

day absence from the United States is far shorter than the six-month limit, and thus "[Mezei] does not govern this case." *Plasencia*, 459 U.S. at 34.

Second, this Court agrees with Judge Wood's conclusion that *Mezei*'s holding turned on "[t]he not-so-veiled subtext of [the] majority opinion . . . that Mezei had lost his entitlement to due process rights, not just because he had spent time abroad, but also because he had abandoned his residence in—and possibly also his loyalty to—the United States by returning to Eastern Europe for over a year." *St. John v. McElroy*, No. 95-CV-9810 (KMW), 1995 WL 753936, at *2 (S.D.N.Y. Dec. 19, 1995) (citing *Hamaya v. McElroy*, 797 F. Supp. 186, 190 & n. 6 (E.D.N.Y. 1992)). A number of courts in this district have thus narrowly construed *Mezei* only to deprive LPRs of constitutional rights where there exists "evidence of a 'willful abandonment' of residency" irrespective of the length of absence. *Garcia v. United States*, No. 96-CV-4061 (BSJ), 1996 WL 412018, at *3 (S.D.N.Y. July 22, 1996); *accord Alba v. McElroy*, No. 96-CV-8748 (DLC), 1996 WL 695811, at *2 (S.D.N.Y. Dec. 4, 1996) ("Alba, as an LPR who left this country to handle the estate of a deceased parent and who has shown no intent to abandon his residency in this country, is entitled to due process."); *Cruz-Taveras v. McElroy*, No. 96-CV-5068 (MBM), 1996 WL 455012, at *5 (S.D.N.Y. Aug. 13, 1996) ("Resident aliens in exclusion proceedings enjoy the same rights, because returning resident aliens are entitled to the same protections they enjoyed before they left, so long as they have not abandoned their United States residence."); *St. John*, 1995 WL 753936, at *4 (refusing to apply *Mezei* despite an approximately two-year absence due to a lack of evidence of abandonment of LPR status). As there is no evidence of abandonment here, *Mezei* is also distinguishable on this ground. *See Thomas v. McElroy*, No. 96-CV-5065 (JSM), 1996 WL 487953, at *2 (S.D.N.Y. Aug. 27, 1996) ("[I]t is clear that Thomas, as a lawful permanent resident

who left the United States for a two-week business trip and showed no intent to abandon his residency in this country, is entitled to due process protections.").

The Government argues that "some returning LPRs, like [Gutierrez] Arias and Mezei, are not entitled to the same level of constitutional protection as others" because they "fall[] within the category of aliens who have rendered themselves arriving aliens by cutting ties with the United States, engaging in illegal activity abroad, or attempting illegal entry." Opp. at 12–13. To the extent the Government is contending that Gutierrez Arias's criminal activity abroad is the constitutionally relevant factor, the Court disagrees. The D.C. Circuit rejected a similar argument in *Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989). It held that

> [t]he [Government's] arguments reduce to the claim that when the Government asserts that an alien has gone abroad for a 'nefarious' purpose, he should not be entitled to due process in determining whether the Government's assertions are accurate. . . . If that is the issue, then the Government's position is worse than unsound; it is at war with the fundamental purpose of the due process guarantee. The Government cannot assert as an argument against procedural safeguards that the accused is guilty as charged. The whole point of due process is that the facts must be determined according to certain procedures that have been agreed upon in advance for reasons of enduring policy divorced from the exigencies of any particular case.

*Id.* at 523–24. Indeed, in *Plasencia*, the Supreme Court held that an LPR who left the United States specifically to undertake illegal activity—there, alien smuggling—retained a right to due process. 459 U.S. at 31. So too here, this Court finds that Gutierrez Arias's criminal activity after having departed the United States, did not deprive him of constitutional protection.[7]

---

[7] In a footnote, the Government appears to argue that *Plasencia* was superseded by statute. Opp. at 13 n. 1 ("Before [Congress passed its most recent legislation], the Supreme Court held [in *Plasencia*] that an LPR returning from a brief trip abroad retains some rights as an LPR, although he may lose those rights if his 'absence is extended.' But the Supreme Court also recognized that Congress changed the law . . . to change the status of certain arriving LPRs to that of arriving aliens." (quoting *Plasencia*, 459 U.S. at 32–34)). Yet *Plasencia* explicitly notes that the *Chew* case, which formed the basis for its ruling, recognized constitutional rights that cannot be abrogated by Congress through legislation. *See Plasencia*, 459 U.S. 21 at 33 ("Any doubts that *Chew* recognized constitutional rights in the resident alien returning from a brief trip abroad were dispelled by *Rosenberg v. Fleuti*, [374 U.S. 449, 460 (1963)].)." The Government's arguments to the contrary therefore "reflect only *statutory and regulatory* distinctions between

Having distinguished *Mezei*, this Court looks to *Chew* and *Plasencia* to determine the level of constitutional protection due LPRs seeking readmission.  In *Chew*, the Court held that an LPR who left the United States on an American vessel for four months was "assimilate[ed] . . . for constitutional purposes, to the status of a continuous resident physically present in the United States." 344 U.S. at 600.  Similarly, the *Plasencia* Court held that an LPR "absent from the country only a few days" possessed "a right to due process just as would a continuously present resident alien."  459 U.S. at 31, 34.  Taken together, these cases support the conclusion that LPRs like Gutierrez Arias possess the same rights at the border as they do inside it, in spite of their brief absence from the United States.  This Court will thus afford Gutierrez Arias the same due process protections enjoyed by continuously present LPRs. *See id.* at 34; *see also Skelly v. I.N.S.*, 168 F.3d 88, 91 (2d Cir. 1999) ("For purposes of this appeal, we assume without deciding that [an LPR arrested at the border] enjoys the same equal protection rights afforded to continuous residents under the Constitution.  Although aliens at the border are generally accorded few constitutional rights, 'once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly.'" (quoting *Plasencia*, 459 U.S. at 32)); *Rodriguez v. Robbins*, 804 F.3d 1060, 1083 (9th Cir. 2015) *cert. granted sub nom. Jennings v. Rodriguez*, No. 15-1204, 2016 WL 1182403 (U.S. June 20, 2016) (hereinafter "*Rodriguez III*") ("The government also argues that lawful permanent residents treated as seeking admission are entitled to lesser due process protections than other lawful permanent residents.  But the government has not provided any authority to support that proposition.").

---

lawful permanent residents; they do not reflect any *constitutional* distinction between those groups." *Rodriguez v. Robbins*, 804 F.3d 1060, 1083 (9th Cir. 2015) *cert. granted sub nom. Jennings v. Rodriguez*, No. 15-1204, 2016 WL 1182403 (U.S. June 20, 2016).

Accordingly, Gutierrez Arias, an LPR who left the country for less than two weeks, is entitled to the same due process protections afforded LPRs continuously present within the United States.

### B.    Mandatory Detention Under § 1225(b)

The Court must next determine whether, like with § 1226(c), the mandatory detention provision at issue in *Lora*, Gutierrez Arias's mandatory detention under § 1225(b) is permissible and whether there are limits to this detention in light of his entitlement to due process.

As discussed above, in *Lora*, the Second Circuit examined § 1226(c), which requires mandatory detention pending removal proceedings of aliens residing inside the United States who were convicted of crimes for which removal is explicitly authorized. In light of the aliens' right to due process, the court held that "mandatory detention under section 1226(c) is permissible, but that there must be some procedural safeguard in place for immigrants detained for months without a hearing." *Lora*, 804 F.3d at 614. "Accordingly, . . . in order to avoid serious constitutional concerns," the court held that "section 1226(c) must be read as including an implicit temporal limitation," or, in other words, "some 'reasonable' limit on the amount of time that an individual can be detained without a bond hearing." *Id.*

This analysis applies equally to the instant Petition. As an LPR who traveled abroad only briefly, Gutierrez Arias possesses "a right to due process just as would a continuously present resident alien." *Plasencia*, 459 U.S. at 34. This Court thus sees no basis to distinguish the constitutional protections claimed by Gutierrez Arias and those afforded to the petitioner in *Lora*. Further, the provision at issue here, § 1225(b), like § 1226(c), requires mandatory detention pending the conclusion of removal proceedings. Moreover, like § 1226(c), nothing in § 1225(b) limits the length of that detention or provides a mechanism for bail notwithstanding the duration

of imprisonment. As Gutierrez Arias is entitled to the same rights afforded the petitioner in *Lora*, this Court reaches the same conclusion regarding § 1225(b) as the *Lora* court did for § 1226(c). To avoid serious constitutional concerns, § 1225(b) must be read to include a reasonable limit on the length of detention.

The Ninth Circuit arrived at the same result in the *Rodriguez* cases. *See Rodriguez II*, 715 F.3d at 1142; *Rodriguez III*, 804 F.3d at 1083. In these decisions, the court confronted the issue of indefinite detention with respect to both § 1226(c) and § 1225(b). *Rodriguez II*, 715 F.3d at 1137, 1142. It first held "that, to avoid constitutional concerns, § 1226(c)'s mandatory language must be construed 'to contain an implicit reasonable time limitation, the application of which is subject to federal-court review.'" *Id.* at 1138 (quoting *Zadvydas*, 533 U.S. at 682). The *Lora* court later relied on this reasoning in adopting the same bright-line limitation. *See Lora*, 804 F.3d at 614–15 (citing *Rodriguez II*, 715 F.3d at 1137).

After addressing § 1226(c), the Ninth Circuit went on to hold that "mandatory detention under § 1225(b), like mandatory detention under § 1226(c), must be construed as implicitly time-limited." *Rodriguez III*, 804 F.3d at 1082. In so doing, it discussed the due process rights afforded to LPRs returning from brief trips abroad and the unconstitutionality of detaining these LPRs indefinitely without a bail hearing. *Id.* The court also distinguished *Mezei* and held that an "LPR whose absence is not prolonged is assimilated to [the] same constitutional status" as those who "'remain[] physically present [in the United States].'" *Rodriguez II*, 715 F.3d at 1142 (quoting *Chew*, 344 U.S. at 596 (1953)).[8]

---

[8] The Government argues that *Rodriguez* is distinguishable because it was a class action. *See* Opp. at 13. Although *Rodriguez* was a class action, the Ninth Circuit based its § 1225(b) constitutional avoidance analysis on a hypothetical class member who—like Gutierrez Arias—was an LPR who retained his due process rights after a short trip abroad. *Rodriguez III*, 804 F.3d at 1083; *see also Rodriguez II*, 715 F.3d at 1142 ("[A]n LPR arrested for alien smuggling upon return from a brief trip abroad *is* entitled to due process protection, specifically because *Mezei* is inapplicable in such a scenario."). The *Rodriguez* case's analysis is thus even more compelling here, where the very type of LPR theorized by the Ninth Circuit is actually before this Court.

The opposite conclusion could yield undesirable results post-*Lora*. If this Court were to rule that Gutierrez Arias could be permissibly detained for an unlimited period of time under § 1225(b), such a decision could result in affording more protections to non-resident aliens detained under § 1226(c), and for whom removal is authorized by law, than to LPRs detained pursuant to § 1225(b) and merely accused of wrongdoing. The Ninth Circuit thought this result untenable, and this Court agrees. *See Rodriguez II*, 715 F.3d at 1143 ("[I]f anything it would appear that the LPRs who fall within § 1225(b)'s purview should enjoy *greater* constitutional protections than criminal aliens who have already failed to win relief in their removal proceedings." (emphasis in original)).

The Government argues that because "the political branches' broad power over immigration is 'at its zenith over at the international border,'" the Court should "defer" to Congress and "not disturb the statutory scheme." Opp. at 6, 13 (quoting *Flores-Montano*, 541 U.S. at 152–53). Congress, it argues, "consider[ed] the different interests at stake concerning the admission of aliens" and took great care to create a statutory scheme that "provides varying degrees of process depending on an alien's particular status [in a way that is] consistent with the Supreme Court's pronouncements that Congress is permitted to distinguish classes of aliens by category." *Id*. at 8–10.

The Court recognizes the deference due to Congress in this area, but that power cannot shield its laws from judicial scrutiny, particularly where constitutional rights are at stake. *See Fiallo v. Bell*, 430 U.S. 787, 793 n.5 (1977) ("Our cases reflect acceptance of a limited judicial responsibility under the Constitution even with respect to the power of Congress to regulate the admission and exclusion of aliens . . . ."); *see also Zadvydas*, 533 U.S. at 695 ("The Government also looks for support to cases holding that Congress has 'plenary power' to create immigration law, and that the Judicial Branch must defer to Executive and Legislative Branch decisionmaking

18

in that area. But that power is subject to important constitutional limitations." (internal citation omitted)); *I.N.S. v. Chadha*, 462 U.S. 919, 940–41 (1983) (rejecting the argument that the political branches have "unreviewable authority over the regulation of aliens" and instead evaluating "whether Congress has chosen a constitutionally permissible means of implementing that power"). The *Chew* Court, for example, rejected the Attorney General's interpretation of a provision regulating which aliens could be prevented from entering the country without any process. 344 U.S. at 598–99. Instead, it "interpret[ed] [the relevant] regulation as making no attempt to question a resident alien's constitutional right to due process," *id.*, a holding the Court later described as an effort to "avoid constitutional problems," *Plasencia*, 459 U.S. at 33 (citing *Chew*, 344 U.S. at 596). Here, as in *Chew*, Petitioner seeks to have the provision under which he is detained construed so as to "'avoid serious constitutional concerns.'" Pet. ¶ 14 (quoting *Lora*, 804 F.3d at 614). As this Court finds that Congress's statutory scheme insufficiently protects the liberty interest of LPRs like Gutierrez Arias, it will not defer to the political branches.

The Government also contends that due process is satisfied by the statute's parole provision, *see* Opp. at 14, which allows the Attorney General or her agents to parole arriving aliens into the United States for "urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A); *see also* 8 C.F.R. § 212.5(b), but precludes review by an immigration judge or any federal court, *see Blake v. Carbone*, 489 F.3d 88, 98 n.7 (2d Cir. 2007). In particular, the Government asserts that "the availability of parole lessens any possible due process concerns that apply to the small category of LPRs who might initially be detained when they arrive from abroad." Opp. at 14 (internal citation omitted). Although this may be true, an LPR such as Gutierrez Arias, who cannot argue that humanitarian reasons or the public benefit compel his release, will remain detained without a bail hearing until the conclusion of his removal proceedings—whenever that

19

may be—a constitutionally impermissible result. This Court thus agrees with the Ninth Circuit that "the discretionary parole system available to § 1225(b) detainees is not sufficient to overcome the constitutional concerns raised by prolonged mandatory detention." *Rodriguez II*, 715 F.3d at 1144; *see also Rodriguez III*, 804 F.3d at 1083 ("Because parole decisions under § 1182 are purely discretionary, they cannot be appealed to [immigration judges] or courts. This lack of review has proven especially problematic when immigration officers have denied parole based on blatant errors."); *but see Ferreras v. Ashcroft*, 160 F. Supp. 2d 617, 624–25 (S.D.N.Y. 2001) (finding, prior to *Lora*, that the parole provision satisfied due process).

As the Court finds that mandatory detention of an indefinite length under § 1225(b)—where parole is available in only limited circumstances—would violate the due process rights of Gutierrez Arias, § 1225(b) must be construed so as to contain an implicit reasonableness limitation.

### C.    Reasonableness Determination

The final issue before the Court is how to determine whether Gutierrez Arias's more-than-twelve-month detention runs afoul of this reasonableness limitation. The Government encourages this Court to conduct an individualized inquiry and find that Gutierrez Arias's detention remains reasonable. *See* Opp. at 17–19. In *Lora*, however, the Second Circuit explicitly rejected that approach.

Instead, the *Lora* court adopted a bright-line rule because: (1) Supreme Court precedent suggests "the preferred approach for avoiding due process concerns in this area is to establish a presumptively reasonable six-month period of detention"; (2) such a rule will prevent inconsistent and confusing results in the district courts; (3) the size of the immigration docket in this circuit counsels in favor of such a rule; and (4) "without a sixth-month rule, endless months of detention,

often caused by nothing more than bureaucratic backlog, has real-life consequences for immigrants and their families." *Lora*, 804 F.3d at 615–16.

These arguments apply to § 1225(b) as forcefully as they did in *Lora* to § 1226(c). *See Rodriguez II*, 715 F.3d at 1144 (adopting a presumptive six-month limit to detention under § 1225(b)). As Gutierrez Arias has been detained for longer than six months—indeed, longer than a year—his continued detention without a hearing is no longer reasonable. He must, therefore, "be afforded a bail hearing before an immigration judge." *Lora*, 804 F.3d at 616.

## CONCLUSION

As this Court is persuaded that Petitioner is entitled to the same level of due process protection afforded to LPRs continuously residing in the United States, the Second Circuit's decision in *Lora* dictates that the Court interpret 8 U.S.C. § 1225(b)(2)(A) to include a reasonable temporal limitation of six months on his detention so as to avoid serious constitutional concerns. As the Second Circuit concluded in *Lora*, the appropriate remedy is an individualized hearing before an immigration judge at which the Petitioner will "be admitted to bail unless the government establishes by clear and convincing evidence that the immigrant poses a risk of flight or a risk of danger to the community." 804 F.3d at 616. The Petition is thus granted.

SO ORDERED.

Dated:    July 14, 2016
           New York, New York

Ronnie Abrams
United States District Judge